### ·  KAUFMAN & RUNGE v. D. W. FORE.

#### No. 2643.

1.  **Homestead—Leasing—Abandonment.**—The fact of leasing does not deprive-homestead property of its homestead character if by the leasing the homestead use is intended to be suspended only temporarily; but if it be leased with intent never again to use it for the purposes which gave the exemption, then the exemption is gone.

2.  **Abandonment of Business ·Homestead.**—A head of a family owned and occupied a homestead in a village; he bought a lot and store house across a public road from the residence for a business house.  In spring of 1886 he sold out his stock of merchandise to his son and leased the lower story to the son to continue the business. The upper story was leased to a physician, as was the lot and the outhouses upon it. The dwelling was sold with *intent to remove to another county.*  There was some household furniture left in the store house and the adjoining lot was occasionally used by the head of the family.  *Held,* that from these facts there was an evident abandonment of the business lot as homestead, and it was subject to execution.

APPEAL from Gonzales.   Tried below before Hon. Geo. McCormick.
The opinion states the case.

*Harwood & Harwood,* for appellants.— 1.   The homestead protection of the Constitution is given for only two purposes; first, to secure to the family a home, a dwelling place; second, to secure to the family a place where the head of the family may pursue his or her calling or business. The purposes for which a lot or lots are used determine their character as homestead or not.   The declaration of the Constitution "that any temporary renting of the homestead shall not change the character of the same when no other homestead has been acquired" carries with it the implication that a renting of the homestead not temporary in character will change the character, i. e., make that which was homestead no longer so.   Wynne v. Hudson, 66 Texas, 7, 8.

2.   The findings of fact by the court show that defendant had made his arrangements to move away from the village of Rancho to live and had rented out the premises in question anterior to the levy and sale, and thereby abandoned it as a place of business, which is further assigned as fundamental error committed by the court in rendering judgment for defendant.   Wynne v. Hudson, 66 Texas, 1.

*Fly & Davidson,* for appellee, filed an argument upon the facts.

STAYTON, CHIEF JUSTICE.—This is an action of trespass to try title brought by appellants, who claim under appellee through a sheriff's sale made on first Tuesday in September, 1886, under the levy of a valid execution made on July 13, 1886.

The appellee claimed in the court below that the property, a store

house and lot, was a part of his homestead, and the judge who tried the cause found this to be true.

All the evidence bearing on the question of homestead or no is as follows: Appellee said: "In 1886 I claimed as my homestead the property mentioned in the deed to Thomas Davis and the property in controversy, which was the only homestead I had. The property sold to Davis was a house and lot on which I resided. That in litigation contained my store house, also a barn and horse lot. The two premises were separated by a public road and about sixty or eighty steps apart. The residence and lot on which it stood I sold for $250. It was a small inferior house. I sold it in the spring of 1886, received the payment in the summer, and made the deed in the fall of 1886. I am a man of family. Have no other homestead. Am now living in Beeville, Bee County, with my son Lee Fore, who is clerking for Skaggs. Have been unable to procure a homestead since I left Gonzales County. My home was in Rancho, a small village with three stores, a blacksmith's shop, and hotel. I contracted the property in controversy to Hansom for $500, to be paid when the title to the same as involved in this suit is determined in my favor. This contract was made in the fall of 1886. Before the levy of the execution I had sold my stock of goods to my son Lee Fore, who was renting the lower story and using it for his store house, and he and Dr. King were sleeping up stairs. After the goods which I had sold to my son were levied upon and sold Dr. King continued to use the upper story for his bed room and drugs, and also the horse lot and barn or stable on the premises, and still so holds them. Mr. Hansom now holds the lower part of the store house, and is merchandising in the house, renting from me. I moved with my family to Beeville to live in September, 1886, but don't remember at what time in the month. It was soon after the storm of August 20, 1886. I had made my arrangements to move to Beeville early in that year, soon after I sold out my merchandise to my son, and for this purpose sold my residence in the spring and afterwards contracted my store house to Hansom."

Dr. King said: "I rented the upper part of the store house for my bed room and to keep my drugs and medicines in, and rented the lot and barn for my buggy and horses. Ever since the defendant moved to Beeville I have been holding the same for him. Before defendant went to Beeville I used the lot and barn and defendant also fed his horses in the the same lot, and I and defendant's son slept up stairs, and defendant also used the up stairs for his company or visitors when he had any. I paid him a small rent for the premises. He still has some furniture in the room up stairs, such as a bureau, a bedstead, dressing table, etc. The main dwelling house where defendant lived had three rooms and a dining room and kitchen. The house and lot were worth about $200; the lot on which it stood was 80 yards wide by about 250 yards long.

When defendant bought the store house and lot from Sherman he gave
$1000 for it, but from stringency of finances, etc., it is now not worth
more than $500."

W. M. Hansom testified that appellee used the store house as his place
of business until about the middle of January, 1886, when he sold his
stock to his son, after which his son continued to occupy it with a stock
of goods until they were attached in July, 1886; that the upper part of
the store house was rented to Dr. King, who used it for bed room and
office, but that defendant's son slept upstairs. He further stated that he
contracted to purchase the property from defendant in the summer of 1886
and was doing a mercantile business in it, but had not paid for it, but
was to do so when the title was settled.

There can be no doubt of the want of intention on the part of appellee
ever again to use the property in controversy as a place of business. Early
in the year he had sold his stock of goods to his son, having made arrange-
ments to move to Beeville at the time he did this.

It is further evident that he did not intend to remain for any purpose
in the town of Rancho, for with a view fully to abandon that place he
sold his residence in the early part of the year, although the deed was
not made until later. There can be no doubt of his intention to abandon
the use of the property for any purpose that would continue the exemption.

The only remaining question is, did he actually abandon it before its
seizure?

The fact of leasing does not deprive homestead property of its home-
stead character if by the leasing the homestead use is intended to be sus-
pended only temporarily, but if it be leased with intent never again to
use it for the purposes which give the exemption then the exemption is
gone.

Before the seizure the lower story had been leased by appellee to his
son, who on his own account was doing business in it with the very stock
of goods that had formerly belonged to appellee, and the facts in evi-
dence forbid the belief that appellee ever intended again to use it as a
place to conduct any business.

The upper story was rented to Dr. King, as were the lot and barn.

Did appellee intend ever again to use that part of the premises for res-
idence or business purposes?

His own testimony answers the question.

The fact that his son may have slept in that part of the house, or that
appellee may have fed his horses in the lot while rented to Dr. King, or
that some of his furniture may have remained in the house by permission
of the lessee, does not furnish evidence of intention to use the property
for any home purposes after the expiration of the lease to Dr. King.

The residence had been sold, the business had ceased, and a residence
in another place had been determined upon.

In fact it appears that he contracted to sell the property to Hansom before the sale was made under execution, and that about that time, in pursuance of his previously formed design, he moved to another place.

The agreement to sell to Hansom does not appear to have been in writing, but it illustrates the intention of appellee. If appellee had reserved the right to use the property for homestead purposes in part while leased to Dr. King there might be some ground for holding that the homestead exemption would continue so long as that use was kept up, slight though the use may have been. There is, however, nothing of the kind shown.

We are forced to the conclusion that the evidence shows a case in which appellee had lost all homestead rights he ever had in the property in controversy.

The judgment of the court below will therefore be reversed and judgment here rendered for appellants.

*Reversed and rendered.*

Delivered March 12, 1889.